UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>WORLD MINING AND OIL SUPPLY<br>a/k/a "WMO"<br>DALI BAGROU<br>GVA INTERNATIONAL OIL AND GAS SERVICES<br>a/k/a "GVA INTERNATIONAL DMCC"<br>BRUNO CAPARINI<br>KS ENGINEERING<br>a/k/a "KS-INZHINIRING CO. LTD."<br>a/k/a "KS-INZHINIRING, LLC"<br>ANTON CHEREMUKHIN<br>OLEG VLADISLAVOVICH NIKITIN | THIRD SUPERSEDING<br>INDICTMENT NO. CR 419-150<br><br>18 U.S.C. § 371<br>Conspiracy<br><br>50 U.S.C. § 4801 et seq.<br>Export Control Reform Act<br><br>18 U.S.C. § 1349<br>Wire Fraud Conspiracy<br><br>18 U.S.C. § 1956(h)<br>Money Laundering Conspiracy<br><br>18 U.S.C. § 2<br>Aiding and Abetting |

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.
2020 OCT 13 PM 3:00
CLERK
SO. DIST. OF GA.

THE GRAND JURY CHARGES THAT:

At all times material to this indictment:

**Defendants and Other Entities**

1. **Company A**, the identity of which is known to the grand jury, was a multinational company that specialized in industrial manufacturing. Company A operated offices and production facilities throughout the United States.

2. **WORLD MINING AND OIL SUPPLY ("WMO")** advertised as a sourcing and supply company that specialized in industrial, mining, and oil and gas products. Its corporate office was located in Dacula, Georgia.

3. **DALI BAGROU** was the President, Owner and Managing Director of Defendant WMO and operated from the WMO offices in Dacula, Georgia.

4. **GVA INTERNATIONAL OIL AND GAS SERVICES (a/k/a "GVA INTERNATIONAL DMCC")**, based in Italy, was a business that offered services in electrical engineering, mechanical and HVAC engineering, and energy and communication systems in the oil/gas, petrochemical, manufacturing and energy industries.

5. **G.V.** was the Commercial Director and Manager of Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES.**

6. **BRUNO CAPARINI** was the Commercial Director of an Italian engineering and construction company based in Italy.

7. **KS ENGINEERING** (a/k/a **"KS-INZHINIRING CO. LTD."** and **"KS-INZHINIRING, LLC,"**) was an engineering service company based in St. Petersburg, Russia, that specialized in systems for coal, gas, oil, nuclear and renewable energy power plants.

8. **ANTON CHEREMUKHIN** was an employee of Defendant **KS ENGINEERING.**

9. **OLEG VLADISLAVOVICH NIKITIN** was the General Director of Defendant **KS ENGINEERING.**

10. **Company B**, the identity of which is known to the grand jury, was a Russian government-controlled business based in St. Petersburg, Russia, that engaged in the extraction, production, transportation and sale of oil and gas.

## The International Emergency Economic Powers Act & The Export Control Reform Act of 2018

11. The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701-1707, granted the President of the United States the authority to deal with unusual or extraordinary threats to the national security, foreign policy, or economy of the United States.

12. Pursuant to Title 50, United States Code, Sections 1705(a) and (c) of IEEPA, it was a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation promulgated thereunder, including the Export Administration Regulations, as more fully described below.

13. The Export Administration Act of 1979, Title 50 Appendix, United States Code, Sections 2401-2420, regulated the export of goods, technology, and software from the United States. Pursuant to the Export Administration Act, the U.S. Department of Commerce ("Department of Commerce") promulgated the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774, which contained restrictions on the export of goods from the United States.

14. Although the Export Administration Act lapsed in August 2001, pursuant to his authority under IEEPA, the President issued Executive Order 13222 on or about August 17, 2001. In that Order, the President declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the Export Administration Act's expiration. Pursuant to IEEPA, the President, and subsequent Presidents, ordered

that the EAR's provisions remain in full force and effect despite the expiration of the Export Administration Act.

15. On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. § 4801 et seq. In part, ECRA provides permanent statutory authority for the EAR. For conduct that predates August 13, 2018, IEEPA is the controlling statute. For conduct occurring after August 13, 2018, ECRA is the controlling statute.

16. Through the EAR, the Department of Commerce, Bureau of Industry and Security ("BIS"), reviewed and controlled the export from the United States to foreign countries of certain U.S. items. 15 C.F.R. §§ 734.2-.3. In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations, or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.

17. The EAR made it unlawful to attempt conduct prohibited by, or contrary to, or refrain from engaging in any conduct required by, the EAR. It was also unlawful to violate any order, license or authorization issued thereunder, or to cause, aid, abet, solicit, attempt, or conspire to commit a violation of the EAR, or any order, license, or authorization issued thereunder. The EAR prohibited the ordering, buying, removing, concealing, storing, use, sale, loan, disposition, transfer, transport,

financing, forwarding, or other servicing, in whole or in part, of any item exported or to be exported from the United States that is subject to the EAR with knowledge that a violation of the EAR, or any order, license, or authorization issued thereunder, has occurred. *See* 15 C.F.R. § 764.2(a)-(k).

## The Commodity

18. The commodity at issue ("the Commodity") was a Vectra 40G power turbine designed and manufactured for integration with gas generators to enable direct drive of high power gas compressors.

## Licensing Requirements and Status

19. The U.S. Department of Commerce required an export license for the export of the Commodity when the Commodity would be used directly or indirectly in exploration for, or production of, oil or gas in Russian deepwater (greater than 500 feet) or Arctic offshore locations or shale formations, or when one was unable to determine whether the item would be used in such projects. (15 C.F.R. Part 746.5 ("Russian Industry Sector Sanctions")).

20. At no time did the defendants, **WORLD MINING AND OIL SUPPLY ("WMO"), DALI BAGROU, GVA INTERNATIONAL OIL AND GAS SERVICES, BRUNO CAPARINI, KS ENGINEERING, ANTON CHEREMUKHIN, OLEG VLADISLAVOVICH NIKITIN**, G.V. or Company B apply for, receive or possess a license or authorization from The Department of Commerce - BIS, to export the Commodity.

**COUNT ONE**
*Conspiracy*
18 U.S.C. § 371

21. The allegations in paragraphs 1 through 20 are incorporated by reference herein.

22. Beginning on a date unknown to the grand jury, but at least in or around February 2017, and continuing until on or about the date of this indictment, in Chatham and Richmond Counties, within the Southern District of Georgia, and elsewhere, the defendants,

**WORLD MINING AND OIL SUPPLY**
**a/k/a "WMO,"**

**DALI BAGROU,**

**GVA INTERNATIONAL OIL AND GAS SERVICES,**
**a/k/a "GVA INTERNATIONAL DMCC,"**

**BRUNO CAPARINI,**

**KS ENGINEERING,**
**a/k/a "KS-INZHINIRING CO. LTD.,"**
**a/k/a "KS-INZHINIRING, LLC," and**

**ANTON CHEREMUKHIN, and**

**OLEG VLADISLAVOVICH NIKITIN,**

aided and abetted by each other and by others unknown, with some joining the conspiracy earlier and others joining later, did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other and with

others known and unknown to the grand jury to commit offenses against the United States, and to defraud the United States, to wit:

a. to willfully export, attempt to export, and attempt to cause the export of the Commodity from the United States when the Commodity would be used directly or indirectly in exploration for, or production of, oil or gas in Russian deepwater (greater than 500 feet) or Arctic offshore locations or shale formations, or when one was unable to determine whether the item would be used in such projects, without first having obtained the required licenses or authorizations from BIS, in violation of Title 50, United States Code, Sections 1702 and 1705; and 15 C.F.R. Part 746.5 and 764.2(a)-(k);

b. to willfully export, attempt to export, and cause the export of the Commodity from the United States when the Commodity would be used directly or indirectly in exploration for, or production of, oil or gas in Russian deepwater (greater than 500 feet) or Arctic offshore locations or shale formations, or when one was unable to determine whether the item would be used in such projects, without first having obtained the required licenses or authorizations from BIS, in violation of 50 U.S.C. § 4819 and 15 C.F.R. Part 746.5 and 764.2(a)-(k); and

c. to fraudulently and knowingly export and send, and attempt to cause to be exported and sent, from the United States, merchandise, articles, and objects contrary to a law and regulation of the United States, that is, Title 18, United States Code, Sections 1343, and 50 U.S.C. §§ 1705 and 4819, in violation of Title 18, United States Code, Section 554.

d. to defraud the Department of Commerce by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations prohibiting the export or supply of goods from the United States to restricted parties without authorization or a license, by deceit, craft, trickery, and dishonest means.

## Objects of the Conspiracy

23. The objects of the conspiracy were:

a. to illegally enrich the conspirators by unlawfully exporting goods from the United States;

b. to evade the regulations, prohibitions, and licensing requirements of the IEEPA, the ECRA, and the EAR; and

c. to conceal the prohibited activities from Company A and the United States Government so as to avoid penalties and disruption of the illegal activity.

## Manner and Means of the Conspiracy

24. It was a part of the conspiracy and among its manner and means that some of the defendants, aided and abetted by each other and others:

a. entered into contracts for the purpose of procuring the Commodity from Company A;

b. knowingly included materially false information in the contracts to obscure the true end user and end use of the Commodity;

c. knowingly created additional false corporate documents and business plans to further obfuscate the intended end user and end

use of the Commodity;

d. knowingly provided Company A materially false and fraudulent information regarding the end user and end use of the Commodity;

e. transmitted and caused to be transmitted email communications by wire in interstate and foreign commerce; and

f. transmitted and caused to be transmitted monetary payments by wire in interstate and foreign commerce.

**Overt Acts**

25. In furtherance of the conspiracy and to accomplish its objects, at least one of the Defendants committed or caused to be committed, in the Southern District of Georgia and elsewhere, at least one of the following overt acts:

a. On or about September 14, 2017, Defendant **BAGROU** contacted Company A via email and requested a service manual for the Commodity, stating that the company he represented wanted to couple it with a General Electric gas generator model LM2500 (the "LM2500 Gas Generator"). Company A replied that it would only share its proprietary information with bona fide end users of the Commodity or their authorized agents.

b. On or about October 18, 2017, Defendant **BAGROU** falsely responded to Company A via email that his company, WMO, would be the end user of the Commodity and that it would be used in Atlanta, Georgia.

c. On or about October 24, 2017, Company A replied to Defendant **BAGROU** that it knew the Commodity would not be installed in Atlanta, Georgia, and reiterated that Company A required full disclosure of end use/end user information "to comply with EU/US export law." On the same date, **BAGROU** forwarded Company A's email to **G.V.**

d. On or about October 24, 2017, **G.V.** drafted a series of materially false responses and other information, such as, "[the Commodity] will be buy (sic), delivered, 'installed' literally in United States Atlanta facilities," and "no export outside US." **G.V.** emailed the response to Defendant **BAGROU** and directed him to send it to Company A.

e. In or around April 2017, Defendant **BRUNO CAPARINI** met with representatives of Company A and attempted to procure the Commodity. He was unsuccessful.

f. On or about December 1, 2017, Defendant **CAPARINI** contacted Company A and inquired again about purchasing the Commodity.

g. On or about January 19, 2018, Company A asked Defendant **CAPARINI** to provide specific information about the end use/end user of the Commodity. **CAPARINI** forwarded the request to **G.V.**

h. On or about January 19, 2018, **G.V.** instructed Defendant **CAPARINI** to write back to Company A that, "we are the end User in name of our owned Group Company: GVA International DMCC, based in Dubai UAE as we are the owner of all equipment. Our intention is to produce and sell Energy not the equipment." As **G.V.** and **CAPARINI** then knew, that information was false. Company A declined to make the sale to Defendants **CAPARINI** or **GVA INTERNATIONAL OIL AND GAS SERVICES**.

i. On or about February 27, 2018, Defendant **KS ENGINEERING**, by and through Defendants **ANTON CHEREMUKHIN** and **OLEG VLADISLAVOVICH NIKITIN**, sent a draft contract proposal to Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES**, by and through **G.V.** In the contract, **GVA INTERNATIONAL OIL AND GAS SERVICES** agreed to obtain and sell the Commodity to **KS ENGINEERING**. The agreement falsely stated that the Commodity would be used at the "Mordovskiy sugar factory, LLC," in Russia, which the parties to the contract and their representatives knew to be false.

j. On or about March 5, 2018, Defendant **KS ENGINEERING**, by and through Defendants **CHEREMUKHIN** and **NIKITIN**, submitted a technical proposal to Company B, in which **KS ENGINEERING** proposed to provide the Commodity to Company B for use with the LM2500 Gas Generator as part of a Turbogenerator on the Prirazlomnaya Marine Ice-Resistant Stationary Platform.

k. On or about June 22, 2018, with the advice and direction of **G.V.**, Defendant **BAGROU** contacted Company A and again inquired about purchasing the Commodity. **BAGROU** told Company A it was for a power plant that **BAGROU** was purportedly planning to build near Atlanta, Georgia. In fact, as **G.V.** and **BAGROU** then knew, **BAGROU** had no plans to build a power plant in Georgia.

l. On or about July 19, 2018, **G.V.** sent a letter on behalf of Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES** to Defendant **KS ENGINEERING**, confirming **GVA INTERNATIONAL OIL AND GAS SERVICES's** receipt of **KS ENGINEERING**'s advance payment on May 8, 2018, and predicting delivery of the Commodity and other components to **KS ENGINEERING** on November 1, 2018.

m. On or about July 20, 2018, Defendant **CHEREMUKHIN** forwarded **G.V.'s** letter to Company B's Deputy Head of Office, Head of the MTR Supply Department, Office of Material and Technical Provision.

n. On or about July 23, 2018, Defendant **BAGROU**, with the assistance and direction of **G.V.**, provided Company A with an affidavit and description of a proposed plan to use the Commodity to build a power unit generator in Savannah, Georgia, which plan **G.V.** and **BAGROU** knew was fictitious and false.

o. On or about September 18, 2018, **G.V.** emailed Defendant **CHEREMUKHIN** the fictitious and false affidavit and business plan submitted to Company A as evidence that **BAGROU** and **G.V.** could successfully procure the Commodity from Company A.

p. On or about September 30, 2018, **G.V.** emailed Defendant **BAGROU** a series of instructions regarding additional false and fictitious information **BAGROU** was to provide to Company A.

q. On or about October 10, 2018, a Undercover Agent ("UCA") based in Savannah, Georgia informed Defendant **BAGROU** that Company A was concerned the Commodity would be exported from the United States without a license to be installed on foreign military naval vessels. Defendant **BAGROU** assured the UCA that the Commodity would remain in the United States after its purchase from Company A. Additionally, **BAGROU** assured the UCA that he was not ordering the Commodity on behalf of another person or company.

r. On or about October 15, 2018, **G.V.** emailed Defendant **BAGROU** a contract between Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES** and **BAGROU's** company, which contract purported to establish a joint venture to build a "portable temporary generation power project." As **G.V.** and **BAGROU** then knew, no such project was actually contemplated and the phony contract was created for the purpose of deceiving Company A.

s. On or about November 1, 2018, **G.V.** emailed Defendant **BAGROU** another series of instructions regarding additional false and fictitious information **BAGROU** was to provide to Company A.

t. On November 2, 2018, Company B sent a letter via email to Defendants **KS ENGINEERING** and **NIKITIN**, reminding **KS ENGINEERING** and **NIKITIN** of the Supply Agreement and stating, "this is to advise you that in the event of another failure to supply the Product on time, [Company B] will have significant financial losses."

u. Between on or about November 23, 2018 and on or about December 2, 2018, Defendant **BAGROU** met with Defendant **CHEREMUKHIN** in Dubai, United Arab of Emirates to discuss ordering and transporting the Commodity from the United States to another country without a license from BIS.

v. On or about November 24, 2018, **G.V.** sent a payment, which originated outside the U.S., from Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES** to Defendant **BAGROU's** company in the amount of $980,000.00 USD. **G.V.** then emailed **BAGROU**, "first payment as per our contract 15 oct 2018 [The Commodity] 980,000 has been sent."

w. On or about November 24, 2018, **G.V.** emailed Defendant **CHEREMUKHIN** proof of the $980,000.00 payment to Defendant **BAGROU's** company, as well as a projected delivery date for the Commodity by **BAGROU's** company. **G.V.** also emailed **CHEREMUKHIN** the phony "portable Temporary Generation Power project" contract between Defendant **GVA INTERNATIONAL** and **BAGROU's** company.

x. On or about November 28, 2018, Defendant **CHEREMUKHIN** emailed a representative of Company B a summary of a meeting between Defendant **KS ENGINEERING** and Company B the previous day. The email documented Company B's stated concerns about the delays in delivery and irregularities in financing. **KS ENGINEERING** "committed to deliver the equipment regardless of the circumstances that impede the implementation delivery (sic)."

y. On or about November 28, 2018, with the advice and direction of **G.V.**, Defendant **BAGROU** sent proof of $980,000.00 USD in available funds to Company A and asked for a formal proposal to finalize the sale of the Commodity.

z. On or about December 11, 2018, after Defendant **BAGROU** sent several more inquiries to Company A, **G.V.** forwarded the inquiries to Defendant **CHEREMUKHIN** and cautioned him to wait for Company A's response, stating, "Daily we are pushing them."

aa. On or about December 13, 2018, **G.V.** sent multiple payments, which originated outside the U.S., from Defendant **GVA INTERNATIONAL** to Defendant **BAGROU's** company, totaling $1,000,000.00 USD, purportedly for "for the project energy [the Commodity]."

bb. On or about December 14, 2018, **G.V.** emailed Defendant **CHEREMUKHIN** to inform him about the $1,000,000.00 USD transfer to Defendant **BAGROU's** company.

cc. On or about December 21, 2018, in response to a request from Company A for more information about the purported energy project in which the Commodity would be used, **G.V.** emailed Defendant **CHEREMUKHIN** and asked **CHEREMUKHIN** to help him craft "A PERFECT ANSWER" to Company A's questions about " 'our' project to produce energy."

dd. On or about December 26, 2018, **G.V.** requested the assistance of an engineer to assure Company A about the feasibility of the purported energy project, falsely telling the engineer that Defendant **BAGROU's** company was the end user of the Commodity and providing the engineer with the false and fictitious business plan.

ee. On or about December 29, 2018, **G.V.** emailed Defendant **BAGROU** a response to Company A's questions about the purported energy project, which **G.V.** and **BAGROU** both knew contained materially false and misleading information. **G.V.** instructed **BAGROU** to "remember to save my file in your computer open it and save again then send what you have save (sic)! don't send this file attached directly (my file (sic) are with my computer id)."

ff. On or about February 8, 2019, Defendant **BAGROU** received and forwarded a budgetary proposal from Company A for the purchase of the Commodity at $7,500,000.00 USD, which **BAGROU** forwarded to **G.V.** **G.V.** then forwarded the proposal (with the Company A price redacted) to Defendant **CHEREMUKHIN**. **G.V.** informed **CHEREMUKHIN** that the price for the Commodity was higher than expected because it was no longer in production and because it was under a "strict end user control."

gg. On or about February 9, 2019, **G.V.**, on behalf of Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES**, sent a Request for Contract Amendment to Defendants **KS ENGINEERING**, **CHEREMUKHIN** and **NIKITIN** based upon the price and delivery time for the Commodity quoted by Company A. In the request, **G.V.** heralded his accomplishment of the "almost impossible mission" of getting Company A to sell the Commodity. He reminded **KS ENGINEERING** personnel that he was able to do so by convincing Company A that the true end user of the Commodity was located in the U.S. **G.V.** went on to state that once **GVA INTERNATIONAL OIL AND GAS SERVICES** had the Commodity, "then from USA we can move [the Commodity] freely and easy between our Company Group Facilities in UAE. . . for delivery to final destination." Pursuant to the amended contract, Defendant **KS ENGINEERING** would pay Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES** 15.408.587 Euro (approximately $17,300,000.00 USD) for the Commodity.

hh. On or about February 23, 2019, after additional questions about the purported energy project from Company A, and after consultation with **G.V.**, Defendant **BAGROU** spoke with a UCA located in Savannah, Georgia, and told the UCA that he would like to purchase the Commodity from a company other than Company A.

ii. On or about March 8, 2019, following further conversation with the UCA and after consultation with **G.V.**, Defendant **BAGROU** sent Company A an email confirming he was no longer interested in purchasing the Commodity through Company A. On the same date, **BAGROU** reached an agreement with the UCA to purchase the Commodity through the UCA's company.

jj. On or about March 11, 2019, Defendant **BAGROU** forwarded the email terminating the Company A relationship to **G.V.**, who forwarded the message to Defendant **CHEREMUKHIN**, adding, "All is good on process as agreed and [the Commodity] is under fabrication. We expect to have contract news on next Friday when [UCA] will be back in Houston."

kk. On or about April 6, 2019, **G.V.** drafted an email to the UCA which he instructed Defendant **BAGROU** to send, in which **G.V.** and **BAGROU** agreed to purchase the Commodity from the UCA's company for $6,500,000.00 USD.

ll. On or about May 8, 2019, Defendant **KS ENGINEERING**, by and through Defendant **CHEREMUKHIN**, entered into a modification of its contract with Defendant **GVA INTERNATIONAL OIL AND GAS SERVICES**, by and through **G.V.**, wherein the parties adjusted the previously negotiated payment amounts and delivery date(s) for the Commodity.

mm. On or about May 8, 2019, **G.V.** forwarded Defendant **CHEREMUKHIN** photographs of the Commodity and stated, "tomorrow i will travel to USA . . . to meet [the UCA] personally in Georgia. . . . I decided to go personally due to the sensitive step of the deal." **G.V.** also forwarded pictures of the Commodity to Defendant **CAPARINI**.

nn. On or about May 8, 2019, Defendant **NIKITIN** texted **G.V.** and stated, "hello Gabrielle I spent some hours with Number 1 today, your photos were in time thank you."

oo. On or about May 10, 2019, **G.V.** and Defendant **BAGROU** met with the UCA in Augusta, GA, to discuss the sale of the Commodity to **BAGROU's** company. The parties agreed that **BAGROU** and **G.V.** would provide a $2,750,000.00 USD down payment to the UCA's company toward purchase of The Commodity.

pp. On or about May 13, 2019, **G.V.**, on behalf of Defendant **GVA INTERNATIONAL OIL AND GAS,** sent Defendants **CHEREMUKHIN** and **KS ENGINEERING** a letter summarizing his meeting with the UCA. In his letter, **G.V.** wrote, "My personal impression of [the UCA] after 2 hours of discussion is that he is a REAL manager involved in [Company A] business and he considerate (sic) us a very interesting USA 'customer' for our energy production program. He believe (sic) that. He AWARE US (sic) that ROSNEF Company linked from Russia contacted AGAIN ONE MONTH AGO ASKING FOR [THE COMMODITY] from Russia!!!!! Of course [Company A] refuse (sic) but the attention is still very high. Therefore please ask client TO STOP ASKING FOR [THE COMMODITY] We have [the Commodity] now with this way."

qq. On or about May 27, 2019, **G.V.** emailed Defendant **CHEREMUKHIN** the pro-forma invoice from the UCA's company and Defendant **BAGROU's** company for the Commodity. **G.V.** advised **CHEREMUKHIN** they needed to send payment to the UCA's company.

rr. On or about June 26, 2019, Defendant **BAGROU**, with the advice and direction of **G.V.**, wired a total of $2,750,000.00 USD, which funds had been previously transferred from a bank account in Poland into a bank account controlled by **BAGROU**, to an account belonging to the UCA's company inside the United States.

ss. On or about August 20, 2019, the UCA sent an email to **G.V.**, in which he stated, in part, "[Company A] is asking way too many questions about the end user for this system being [Company B] and they are threatening to stop the shipment based on breach of contract. . . . Please confirm you have received this email and keep this between us . . . ." On the same date, **G.V.** replied to the UCA by email, "yes received. All is ok. I take care and I am working on the transfer."

tt. On or about August 27, 2019, **G.V.** flew from outside the U.S. to Savannah, Georgia, to meet with the UCA and Defendant **BAGROU** to finalize the purchase of the Commodity.

uu. On or about August 28, 2019, **G.V.** and Defendant **BAGROU** met with the UCA and another undercover agent in Savannah, Georgia, to discuss the sale of the Commodity. During the meeting, **G.V.** discussed how the UCAs should falsify the shipping documents for the Commodity to conceal the true end use and user.

vv. On or about August 28, 2019, **G.V.** sent a message to Defendant **CHEREMUHKIN**: "Anton we need $500,000 USD this week today to transfer I am in meeting cannot talk. Just see me yes we need this immediately is emergency situation I will explain later..."

ww. On or about September 1, 2019, Defendant **CHEREMUHKIN** asked **G.V.** to send additional photographs of the Commodity. **CHEREMUHKIN** said Defendant **NIKITIN** would travel to the U.S. to view the Commodity to ensure it was available.

xx. On or about September 17, 2019, Defendant **NIKITIN** traveled to the Southern District of Georgia to view the Commodity.

All in violation of Title 18, United States Code, Sections 371 and 2.

## COUNT TWO

*Violation of the Export Control Reform Act*

50 U.S.C. § 4819

26. The allegations in paragraphs 1 through 20 are incorporated by reference herein.

27. On or about June 26, 2019, in Chatham and Richmond Counties, within the Southern District of Georgia, and elsewhere, the defendants,

**WORLD MINING AND OIL SUPPLY**
**a/k/a "WMO,"**

**DALI BAGROU,**

**GVA INTERNATIONAL OIL AND GAS SERVICES,**
**a/k/a "GVA INTERNATIONAL DMCC,"**

**BRUNO CAPARINI,**

**KS ENGINEERING,**
**a/k/a "KS-INZHINIRING CO. LTD.,"**
**a/k/a "KS-INZHINIRING, LLC," and**

**ANTON CHEREMUKHIN, and**

**OLEG VLADISLAVOVICH NIKITIN,**

aided and abetted by each other and by others known and unknown to the grand jury, did willfully attempt to export and attempt to cause the export of the Commodity from the United States, knowing the Commodity would be used directly or indirectly in exploration for, or production of, oil or gas in Russian deepwater (greater than 500 feet) or Arctic offshore locations or shale formations, or being unable to determine whether the item would be used in such projects, without first having obtained the

required licenses or authorizations from BIS, in violation of 50 U.S.C. § 4819 and 15 C.F.R. Part 746.5 and 764.2(a)-(k).

**COUNT THREE**
*Conspiracy to Commit Wire Fraud*
18 U.S.C. § 1349

28. The allegations in paragraphs 1 through 20, 23 and 24 are incorporated by reference herein.

29. Beginning on a date unknown to the grand jury, but at least in or around September 2017, and continuing until on or about the date of this indictment, in Chatham and Richmond Counties, within the Southern District of Georgia, and elsewhere, the defendants,

**WORLD MINING AND OIL SUPPLY**
**a/k/a "WMO,"**

**DALI BAGROU,**

**GVA INTERNATIONAL OIL AND GAS SERVICES,**
**a/k/a "GVA INTERNATIONAL DMCC,"**

**BRUNO CAPARINI,**

**KS ENGINEERING,**
**a/k/a "KS-INZHINIRING CO. LTD.,"**
**a/k/a "KS-INZHINIRING, LLC," and**

**ANTON CHEREMUKHIN, and**

**OLEG VLADISLAVOVICH NIKITIN,**

aided and abetted by each other and by others unknown, with some joining the conspiracy earlier and others joining later, did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other and with others known and unknown to the grand jury to execute and attempt to execute a scheme and artifice to defraud Company A of property, and to obtain property under the custody and control of Company A by means of materially false and fraudulent pretenses, representations and promises, and to transmit and cause to be transmitted by wire in interstate and foreign commerce some communication for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Sections 1349 and 2.

**COUNT FOUR**
*Money Laundering Conspiracy*
18 U.S.C. § 1956(h)

30. The allegations in paragraphs 1 through 20, 23 and 24 are incorporated by reference herein.

31. Beginning in or around September 2017, the exact date being unknown to the grand jury, and continuing until on or about the date of this indictment, in Chatham and Richmond Counties, within the Southern District of Georgia, and elsewhere, the defendants,

**WORLD MINING AND OIL SUPPLY**
**a/k/a "WMO,"**

**DALI BAGROU,**

**GVA INTERNATIONAL OIL AND GAS SERVICES,**
**a/k/a "GVA INTERNATIONAL DMCC,"**

**BRUNO CAPARINI,**

**KS ENGINEERING,**
**a/k/a "KS-INZHINIRING CO. LTD.,"**
**a/k/a "KS-INZHINIRING, LLC," and**

**ANTON CHEREMUKHIN, and**

**OLEG VLADISLAVOVICH NIKITIN,**

aided and abetted by each other and by others unknown, with some joining the conspiracy earlier and others joining later, did knowingly and willfully combine, conspire, confederate, agree and have a tacit understanding with each other and with others known and unknown to the grand jury to violate:

a. Title 18, United States Code, Section 1956(a)(2)(A), that is, to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, funds, to a place in the United States from and through a place outside the United States, that is, Poland, with the intent to promote the carrying on of a specified unlawful activity, to wit: Conspiracy to violate the Export Administration Regulations, an offense relating to violations of the International Emergency Economic Powers Act and the Export Control Reform Act of 2018, as charged in Count One of this indictment; and

b. Title 18, United States Code, Section 1956(a)(2)(A), that is, to transport, transmit, and transfer, and attempt to transport, transmit, and transfer, funds, to a place in the United States from and through a place outside the United States, that is, Poland, with the intent to promote the carrying on of a specified unlawful activity, to wit: Conspiracy to Commit Wire Fraud, as charged in Count Three of this indictment.

All done in violation of Title 18, United States Code, Sections 1956(h) and 2.

## FORFEITURE ALLEGATION

32. The allegations contained in Counts One through Four of this indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(c), Title 18 United States Code, 982(a)(1), Title 28, United States Code, 2461(c), and Title 50, United States Code, 4820.

33. Upon conviction of any of the offenses alleged in Counts One through Three of this indictment, defendants,

**WORLD MINING AND OIL SUPPLY**
**a/k/a "WMO,"**

**DALI BAGROU,**

**GVA INTERNATIONAL OIL AND GAS SERVICES,**
**a/k/a "GVA INTERNATIONAL DMCC,"**

**BRUNO CAPARINI,**

**KS ENGINEERING,**
**a/k/a "KS-INZHINIRING CO. LTD.,"**
**a/k/a "KS-INZHINIRING, LLC," and**

**ANTON CHEREMUKHIN, and**

**OLEG VLADISLAVOVICH NIKITIN,**

shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 50, United States Code, 4820. The United States will also seek a forfeiture

money judgment for a sum of money equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to these offenses.

34. Upon conviction of the offense alleged in Count Four, the defendants,

**WORLD MINING AND OIL SUPPLY**
**a/k/a "WMO,"**

**DALI BAGROU,**

**GVA INTERNATIONAL OIL AND GAS SERVICES,**
**a/k/a "GVA INTERNATIONAL DMCC,"**

**BRUNO CAPARINI,**

**KS ENGINEERING,**
**a/k/a "KS-INZHINIRING CO. LTD.,"**
**a/k/a "KS-INZHINIRING, LLC," and**

**ANTON CHEREMUKHIN, and**

**OLEG VLADISLAVOVICH NIKITIN,**

shall forfeit to the United States any property, real or personal, involved in the offense, or any property traceable to such property pursuant to Title 18, United States Code, Section 982(a)(1). The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, involved in this offense, and any property traceable to such property.

35. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a. cannot be located upon exercise of due diligence;
b. has been transferred or sold to, or deposited with, a third party;
c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value;
e. has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

A True Bill.

Bobby L. Christine
United States Attorney

Jennifer G. Solari
Assistant United States Attorney
Senior Litigation Counsel
*Lead Counsel

Karl I. Knoche
Assistant United States Attorney
Chief, Criminal Division

Steven H. Lee
Assistant United States Attorney
*Co-lead Counsel

*//s// William A. Mackie*

William A. Mackie
Trial Attorney
Counterintelligence and Export Control Section
National Security Division